LOTTINGER, Judge.
This is a workmen’s compensation proceeding wherein benefits are sought for total permanent disability allegedly arising out of an accident which occurred on July 20, 1959, when plaintiff “was digging with a pick and struck a hard asphalt base in an iron box, thereby jolting his left arm * * * ”, It appears that compensation payments were made in the amount of $35.00 per week for the period from July 20, 1959, through November 2, 1959. The trial judge denied plaintiff’s demands for additional benefits and he has appealed.
Dr. Louis J. James, Jr., general practitioner, testified that he saw the plaintiff at about 11 o’clock of the morning of July 20, 1959, at which time plaintiff related to him that he had had an accident at about 8 o’clock that morning. He found “small nodules, small, well, elevations on the forearm and on the back of the arm. In other words, the extensor and flexor surfaces of the arm.” He did not know what the nodules were and referred plaintiff to Dr. George Azar.
Dr. Azar, general surgeon, called by the plaintiff, gave the following testimony:
“A. On July 27, 1959 Julius Green was referred to me by Dr. James. The original history was that about 8:00 A.M. on the morning of July 20, 1959, while digging with a pick into asphalt in an iron box, the pick struck the iron flooring and jolted his left fore *79 arm. He stated that the forearm began swelling immediately thereafter and that it was painful. He consulted his family physician who instructed him to use heat, he was given sedation and instructed to rest the arm. Physical examination on July 27, 1959, revealed swelling of the left forearm and arm, that it was painful and there were a number of small nodules over the course of the veins on the back of the forearm. He was sent to the Baton Rouge General Hospital and x-rays of the forearm and wrist were made. The report indicated no fracture, dislocation, or bony pathology. Julius Green was admitted to the hospital with a tentative diagnosis of throm-bophlebitis because of the elevation of temperature, pain over the course of the veins, and the general enlargement ■of the forearm and arm. He remained in the hospital until August 4, 1959, at which time his temperature had subsided and his general condition had improved considerably. A routine blood count made in the hospital, as also urinalysis, were essentially normal. Julius Green was then seen periodically in my office. His condition did not subside as rapidly as I would have liked to have seen, and one of the nodules of the forearm was opened and a pathological study of the pus was made by the pathologist of the Raton Rouge General Hospital. This was reported on August 15, 1959 as staphylococcus, which is one of the ■common pus producing organisms. Antibiotics were instituted which were found sensitive to the organism. Again on September 4, an entire nodule was removed under local anesthesia in an effort to make a definitive diagnosis. This was reported on September 4, 1959 as fibrosis granulation tissue and widespread chronic inflammation and foreign body giant cell formation. On September 8, 1959 another lesion was sent for study on the basis of any fungus infection. This was reported from the Department of Health in New Orleans as negative for pathogenic fungi. We continued to treat Julius Green in a conservative manner up to November 2, 1959, at which time the final examination revealed the upper extremities equal in size by actual measurement. There were no significant findings in either shoulder girdle, by comparison both forearms were equal in size as were also the wrists and hands. The joint movements of the shoulder, elbow, wrists, and fingers, were full and adequate, and Julius Green had 100% motion of these joints. There were no draining sinuses or palpable nodules in the arm or forearm at that time and no- skin lesions were identified. He was discharged to return to the same type of work he was employed in prior to his injury. In summation, the original diagnosis of traumatic throm-bophelbitis entertained upon admission to the hospital could have been present, however, the possibility of a lumphatic infection on the basis of fungus disease introduced through a minor laceration or traumatic abrasion of a finger cannot be discounted. In the event that a fungus infection was present and in view of the fact that positive diagnosis of fungus disease was not proven does not discredit the possibility. I believe that this represented a lymphangitis with infected lymphatic glands, and that this type of condition is limited in its scope and always gets well in approximately three to four months with no permanent disability involved.”
“Q. Doctor, if I am correct the inference from your testimony you are more inclined to believe now at the conclusion of this case that he probably had some kind of a lymphatic infection when you first saw him?
“A. Yes, sir.
*80 "Q. You also stated I believe that an infection of the kind that you believe he had would have in all probability, and of necessity I believe, have been introduced into the system through some break in the skin, however minor it might have been. I believe you said a scratch on the finger or something like that.
“A. Yes, sir.
“Q. Now, the accident that he described to you as having occurred on July 20, 1959 did not involve' any break in the skin, did it?
“A. I didn’t see him until a week later.
“Q. I understand, but the one he described was merely a jolt, when he struck his pick into the ground, it jolted his arm.
“A. That’s right.
“Q. Now even assuming that the accident which he described as having happened when he struck his pick and received a jolt in the arm, you are assuming that that had caused a break in the skin surface which was the source of the infection getting into the body, would it be reasonably medically possible for infection to have reached such a degree of infection, I guess, that the affected arm would have developed a number of nodules of both the dorsal and ulna side of the forearm within a period of three hours?
“A. Did you say three hours ?
“Q. Yes, sir.
“A. No sir.
“Q. If that was the history which was given to you in this case that he struck the pick into the ground into a hard object and received a jolt and that immediately within a period of three hours the nodules developed on his arm would you have, would you be able to medically explain the process by which the infection could have reached that stage as the result of the pick incident?
“A. No, this man presented himself with this arm with nodules on the forearm and we tried every method to make a definitive diagnosis. In some of these fungus infections a diagnosis is extremely difficult to make. He would not in a period of three hours have demonstrated this much infection and the question of the time element as to how long it would take I have seen glands in the axilla appear in twenty four hours after infection had been started. Does that answer your question?
Dr. Howard Hansen, general practitioner called by the plaintiff, saw the latter several times during the month of March 1960. He testified as follows:
“Q. Now the complaint which he has, is it consistent with the type of injury which he received?
“A. I would not be able to say that it was definitely consistent. I have never seen an infection or a sup-purative thrombophlebitis follow the type of injury that he described to me which did not involve trauma to the arm as near as I can recall, that he just swung a pick and when it hit the object that he was picking he had severe pain in the arm and then noticed knots and soreness in the arm. That type of an incident if there had been a previous existing infection of the hand or something like that might have aggravated the condition, but I don’t believe it would have caused it. At least not in my experience I have never seen that type of thing cause the subsequent events pertaining to this incident.”
“Q. From what you have just testified, doctor, it is within your opinion that this injury which Green had had some direct bearing whether it was *81 aggravated or direct cause upon his complaint ?
“A. From my knowledge and examination of the man I wouldn’t be able to come to any conclusion as to whether it was caused or aggravated by the incident that he described. I really don’t know. I think we would have to rely upon the testimony of the doctor who treated him immediately following this incident.”
“Q. And as I understand it you never heard of an infectious condition resulting immediately and spontaneously from an accident of the type Green described to you?
“A. That’s correct.”
“Q. As I understand it, yo-u are unwilling to say as a medical expert that there was any connection between the accident Green described to you and the condition which you found when you examined him in March of 1960?
“A. That’s correct.”
The plaintiff also called Dr. Thomas Campanella, orthopedist. This gentleman testified that he examined plaintiff on March 28, 1960, at which time he was “unable to find any evidence of orthopedic pathology”.
Dr. Charles McVea, general surgeon called by the defendant who examined plaintiff during the month of May, 1960, testified as follows:
“A. I thought that Julius had had some type of infection in his left arm one week after the incident he described. I did not think that the incident as he described it produced infection in his arm, and quite likely this came from some other cause, inasmuch as he told me that he had a jarring injury to his forearm without any described break in the skin or other direct blow or injury to the forearm. He was treated for this infection and was said to have had a throm-bophlebitis at that time. I do not know whether he had a thrombophlebitis or whether he had an infection of the arm, I could not tell at the time of my examination, whether he had had either or both. I would not have thought from his history that the injury that he described would have produced an infection in his forearm. However, I thought when I saw him that he had recovered from the effects of the infection which he had and that he was able to do work which he was doing at the time of the incident he described as causing the trouble.”
From the above and foregoing it is obvious that the evidence does not preponderate in favor of the plaintiff. On the contrary, it would seem to establish that he suffered from some type of infection which could not have developed within only a few hours of the alleged accident. He has, therefore, failed to prove his case and the judgment appealed from should stand affirmed.
Judgment affirmed.